Sheldrick Jerome HERROD *v.* STATE of Arkansas

CR 07-219                                   262 S.W.3d 609

Supreme Court of Arkansas
Opinion delivered September 20, 2007

*William R. Simpson, Jr.*, Public Defender, *Bret Qualls*, Deputy Public Defender, by: *Erin Vinett*, Deputy Public Defender, for appellant.

*Dustin McDaniel*, Att'y Gen., by: *Leaann J. Irvin*, Ass't Att'y Gen., for appellee.

ROBERT L. BROWN, Justice. Appellant Sheldrick Jerome Herrod was convicted of capital murder, attempted capital murder, two counts of aggravated robbery, and one count of theft of property. He was sentenced to life without parole for capital murder, life imprisonment for attempted capital murder, forty years for each count of aggravated robbery, and one year in the county jail plus a $1000 fine for misdemeanor theft of property. All sentences except the sentence for theft of property are to run consecutively. Herrod's sole point on appeal is that the circuit court erred in refusing to disqualify Deputy Prosecutor John Johnson as the prosecutor at his jury trial. We conclude there was no abuse of discretion by the circuit court, and we affirm.

The facts, according to the witnesses at trial, are these. In the early hours of the morning on March 2, 2006, Herrod was with Tinika Wakwe at her apartment in southwest Little Rock. Also at the apartment were Tony Mayo, Cortez Bone, and Kathy Owens. Wakwe, Mayo, Bone, and Owens were drinking alcohol and taking cocaine. Later, the group left Wakwe's apartment and went to Legends bar on Rodney Parham in a Nissan X-Terra. In the

parking lot of the bar, Herrod began talking to the victims, Kari Evans and James Cody Dobbins. According to Evans, Dobbins wanted to buy some cocaine, and Herrod said that he would sell it to him. Herrod and his acquaintances left Legends and drove a few blocks away to the parking lot of a Chinese restaurant. There, they met Dobbins and Evans, who arrived in Evans's black BMW. Herrod took a gun from the X-Terra, got into the back seat of the BMW, and rode with the couple to southwest Little Rock. Herrod's acquaintances accompanied them in the X-Terra.

While Evans was driving the BMW to southwest Little Rock, Herrod shot Dobbins in the back of the head. Evans pulled up to a stop and exited the car, followed by Herrod, who got out of the back seat. At the same time, Bone got out of the X-Terra, looked inside the passenger side of the BMW, and then went back to the X-Terra. Herrod approached Evans, took money from her, and shot her three times. Dobbins died from a single gunshot wound to the head. Evans survived the shooting with serious injuries. Herrod and his four acquaintances left the scene in the X-Terra, leaving Evans and Dobbins in the BMW.

Suzanne Chapman, who lived in a nearby apartment, was awakened by the first gunshot.[1] When she heard a second gunshot, she got up and looked out her window, which was on the second floor of her apartment building. She saw Herrod shooting at the occupants of the car. She called 911, and Little Rock police officers arrived shortly thereafter.

Herrod and his four acquaintances returned to Wakwe's apartment. Herrod became a suspect in the case after Mayo gave a statement to the police concerning the night's events. On April 5, 2006, Herrod was charged with the offenses for which he was ultimately convicted.

On July 10, 2006, Deputy Prosecutor John Johnson and Victim Witness Coordinator Susie Barnes went to Suzanne Chapman's apartment to interview her concerning the events on the night of the shooting. After speaking to Chapman for several minutes, Johnson showed her a photo spread prepared by the Little Rock Police Department, which included Herrod. Chapman identified Herrod as the shooter. Subsequently, Herrod moved to

---

[1] At times in the record, Suzanne Chapman is erroneously referred to as "Suzanne Chandler."

suppress the photo identification because of what he contended were the "impermissibly suggestive photos" used.

On July 31, 2006, the circuit court held a hearing on Herrod's motion to suppress Chapman's identification of Herrod. Herrod argued that Chapman should be barred from identifying Herrod in court because of the lateness of her photo spread identification. In the alternative, he requested a hearing on his written motion that the photo spread was unconstitutionally suggestive. The circuit court denied his motion to bar Chapman from testifying but granted the request for a hearing.

At the hearing, John Johnson testified about the events surrounding Chapman's identification of Herrod from the photo spread. He added that he had interviewed many witnesses during his time as a prosecutor and that this was not the first time he had shown a witness a photo spread. Barnes and Chapman also testified about the events surrounding the photo identification. At the end of the hearing, Herrod moved to disqualify John Johnson as the prosecutor because he had testified at the suppression hearing on contested matters. The circuit court declined to disqualify Johnson as trial prosecutor. The court reasoned that the State had said it was not going to use the photo-spread identification at trial but only an in-court identification by Chapman. The court concluded that there was no necessity for Johnson to testify and that he had only participated in a "routine investigation" of Chapman.

At the beginning of the trial on August 1, 2006, Herrod raised the question to the court of whether he was barred from calling Johnson as a witness to attack the credibility of Suzanne Chapman's in-court identification. Herrod added that he was not certain that he would call Johnson but wanted to have that option, depending on Chapman's testimony. The court did not bar him from calling Johnson as a witness, but said that it would consider the materiality of Johnson's testimony only when Herrod had made a definite decision to call Johnson as a witness.

During the State's case, Suzanne Chapman testified as to the events of the evening and made an in-court identification of Herrod as the shooter. At the time of Chapman's testimony, Herrod objected to her in-court identification, citing the "tainted photo spread." No mention of Johnson was made as part of Herrod's objection. On cross-examination, defense counsel questioned Chapman about her ability to see the events on the night of the killing. He did not, however, ask to call Johnson as a witness. The defense rested without calling any witnesses.

Herrod argues on appeal that by conducting the photo spread for Suzanne Chapman, John Johnson exceeded his role as prosecutor and became an active investigator for the State. As an active investigator, he contends, Johnson was a material witness and was barred, both under Arkansas case law and by Rule 3.7 of the Model Rules of Professional Conduct from prosecuting the case for the State. He contends that the material matter for which Johnson was a witness was Chapman's in-court identification of himself. He also asserts that this identification was strongly influenced by and based on the photo spread, because Chapman could not have had ample opportunity to observe the shooter on the night of the shooting. He points out that Johnson's actions in interviewing Chapman and showing her the photo spread led to his testimony at a pretrial suppression hearing. Arkansas case law, he maintains, does not require that the prosecutor actually be called as a witness in the trial in order to require disqualification but only that he be a potential witness.

It is clear to this court that Herrod has not appealed the circuit court's admission of Chapman's in-court identification. Rather, his issue is that, regardless of the circuit court's ruling on the admissibility of Chapman's in-court identification, the prosecutor should have been disqualified because he was a potential witness to Chapman's identification of the defendant from the photo spread and that identification raised material issues regarding (1) the admissibility of Chapman's in-court identification and (2) the weight the jury should have given to that identification.

Before addressing whether or not the circuit court erred in refusing to disqualify Johnson, it is necessary to address a threshold issue raised by the State. The State claims that Herrod's issue became moot when the State decided not to introduce evidence of the photo spread at trial. We disagree. Herrod alleged, at the preliminary hearing and at trial, that Chapman's in-court identification was based on the allegedly suggestive or "tainted" photo spread, rather than on what Chapman observed on the night of the shooting. This issue was not extinguished by the fact that the State chose not to introduce evidence of Chapman's photo-spread identification at trial. Rather, the continuing issue is whether Johnson was a material witness on the point of whether the photo spread influenced Chapman's in-court identification.

We turn then to the merits of whether the circuit court erred in failing to disqualify Johnson. We initially note that "[t]his court reviews a trial court's decision to disqualify an attorney under an

abuse–of–discretion standard." *Weigel v. Farmers Ins. Co., Inc.*, 356 Ark. 617, 621, 158 S.W.3d 147, 150 (2004). This court has addressed the issue of the disqualification of a prosecutor on three occasions in the last twenty years. *See Chellette v. State*, 308 Ark. 364, 824 S.W.2d 389 (1992); *Scherrer v. State*, 294 Ark. 227, 742 S.W.2d 877 (1988); *Duncan v. State*, 291 Ark. 521, 726 S.W.2d 653 (1987).

In *Duncan v. State*, the prosecuting attorney interrogated the defendant before trial, and a motion was made, again before trial, to disqualify the prosecutor as the State's advocate because of the probability of his being called as a witness by either the State or defendant at trial. The circuit court denied the motion. The prosecutor did testify as a witness at the pretrial suppression hearing and was called as a witness by the defense during the penalty phase of the trial to testify on unrelated matters. However, in closing argument, the prosecutor expressed his opinion on a crucial element of the case, which was whether the defendant was isolated when in jail. Because of this, we held that he had become a witness for the State and that his representation as counsel was reversible error. 291 Ark. at 532-33, 726 S.W.2d at 659.

As part of our analysis in *Duncan*, we set out the law on prosecutor disqualification: "We do agree that when a prosecutor undertakes an active role in the investigation of a crime to the extent that he becomes potentially a material witness for either the state or the defense he can no longer serve as an advocate for the state in that case." *Id.*

In *Scherrer v. State*, the prosecutor took a statement from a witness before trial who implicated the defendant, and the prosecutor also made an offer of immunity to that witness. The defense called the prosecutor to testify at trial about this statement and the immunity offer. We held that the prosecutor's actions were routine preparation for trial and that he had not taken "such an active role that he potentially became a material witness in the case." 294 Ark. at 233, 742 S.W.2d at 880.

Finally, in *Chelette v. State*, the prosecutor was called as a defense witness to discuss how he assisted the defendant and a third party in signing a probable–cause affidavit against another individual. We held that the prosecutor had performed a routine, ministerial duty. We held, further, that the prosecutor's closing argument simply described his theory of the case and did not contain testimony on pertinent, contested facts, as was the situation in *Duncan*. 308 Ark. at 369-70, 824 S.W.2d at 389, 392.

We have also emphasized that disqualification motions should not be a ploy to remove the prosecutor: "[T]he rule against a prosecuting attorney acting both as an advocate and a witness was not designed to permit defense counsel to call the prosecuting attorney as a witness and thereby disqualify him as the state's advocate." *Williams v. State*, 300 Ark. 84, 88, 776 S.W.2d 359, 361 (1989). We went on to say that a prosecutor should be disqualified only when the prosecutor's "active part in investigating the crime or in interrogating the appellant" render his or her testimony necessary. *Id.*

■ We conclude that the circuit court did not abuse its discretion in declining to disqualify Johnson because Herrod has failed to convince either the circuit court or this court why Johnson was a material witness at trial. Under this court's precedent, Johnson's decision to conduct a photo spread with Suzanne Chapman was insufficient to qualify as an active role in the investigation. *See Scherrer*, 294 Ark. at 233, 742 S.W.2d at 880 (holding that a prosecutor's involvement in taking a statement from a witness did not require his disqualification). In this regard, Herrod is not persuasive on why this court should distinguish between an interview in which a photo spread is shown to a witness and questioning a witness where no such spread is used but questions are asked of the witness about the suspect. In either case, the interviewer is eliciting information from the witness regarding the crime, and in *Scherrer*, we said the latter circumstances did not warrant disqualification.

The situation here is also like *Chellette* in that Johnson's testimony at the pretrial hearing was related to his duties in the scope of his role as prosecutor. Mere performance of those duties did not warrant disqualification. 308 Ark. at 369, 824 S.W.2d at 392. The only contested matter that Johnson testified to at the suppression hearing had to do with the contents of the photo spread. Those contents were available for the court and, had the issue been raised at trial, for the jury to see and evaluate independently of what Johnson did. Therefore, Johnson's testimony was not related to contested "facts favorable to the State." *Id.* At most, his testimony would have been a vehicle for authenticating and introducing the photo spread at trial. But neither the State nor Herrod chose to present the photo spread evidence.

Moreover, Herrod failed to develop the issue at trial of how Johnson's involvement with the photo spread influenced Chap-

man's in-court identification. He did not cross-examine Chapman on this point or attempt to call Johnson to shore up his argument that the photo spread entrenched Herrod's face in Chapman's mind for purposes of the in-court identification. Without this showing of why Johnson's testimony was material at trial, there was no basis for the circuit court to rule that he should be disqualified.

An examination of the record has been made in accordance with Ark. Sup. Ct. R. 4-3(h) and Ark. R. App. P.–Crim. 14, and it has been determined that there were no rulings adverse to Herrod which constituted prejudicial error.

Affirmed.